FILED
10/5/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEVON HORTON | No. 25 CR 654-1<br><br>Judge Thomas M. Durkin |

# PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, and defendant DEVON HORTON, and his attorney, TERENCE CAMPBELL, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2. The amended indictment in this case charges defendant with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346 (Counts 1-13); embezzlement of federal program funds, in violation of Title 18, United States Code, Section 666(a)(1)(A) (Counts 14-15); and tax evasion, in violation of Title 26, United States Code, Section 7201 (Counts 16-17).

3. Defendant has read the charges against him contained in the amended indictment, and has discussed the charges with his attorney to his satisfaction.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count 1 of the amended indictment, which charges defendant with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346; Count 14, which charges defendant with embezzlement of federal program funds, in violation of Title 18, United States Code, Section 666; and Count 16, which charges defendant with tax evasion, in violation of Title 26, United States Code, Section 7201.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts 1, 14, and 16 of the amended indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, constitute relevant conduct pursuant to Guideline §1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

### Count 1

Beginning no later than in or around April 2022, and continuing to in or around June 2023, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant DEVON HORTON, together with Antonio Ross, Samuel Ross, and Alfonzo Lewis, knowingly devised, intended to devise, and participated in

a scheme to defraud Evanston School District 65 of money and property, by means of materially false and fraudulent pretenses, representations, and promises, and of the intangible right to the honest services of HORTON through kickbacks.

## ***Background***

Evanston/Skokie School District 65 ("District 65") was a public school district and unit of local government governed by the District 65 Board of Education (the "District 65 Board") and located in the Northern District of Illinois. District 65 contracted with certain vendor-companies to provide professional services that supported the district's operations and initiatives.

HORTON was employed as the superintendent of District 65. HORTON's duties as superintendent included, among other things, management and supervision of the day-to-day operations of the district, review and approval of proposals from vendor-companies that sought to provide professional services to the district, execution of the district's contracts with vendor-companies that provided professional services to the district, and review and approval of invoices vendor-companies submitted for professional services that were provided to the district. As District 65's superintendent, HORTON was an agent of District 65 and owed a duty of honest services to District 65.

Antonio Ross, Samuel Ross, and Alfonzo Lewis were friends of HORTON. HORTON acknowledges that (a) Antonio Ross was employed by Chicago Public Schools ("CPS") as the principal of Hyde Park Academy High School and owned Connecting the Dots Leadership Initiative, LLC ("Connecting the Dots"); (b) Samuel Ross owned Asset Protection Specialist, LLC ("Asset Protection"); and (c) Alfonzo Lewis was employed by CPS as the athletic director of Hyde Park Academy and also owned New Flight 35 Sports & Academic Academy, LLC ("New Flight 35"). Connecting the Dots, Asset Protection, and New Flight 35 are referred to collectively herein as the "Companies."

***District 65 Policies and Procedures***

HORTON acknowledges that the District 65 Policy Manual set forth the purchasing and contracting policies employed by District 65, including: (a) the superintendent would manage the district's purchases and contracts in accordance with the law and the standards set forth in the District 65 Policy Manual; and (b) every district purchase and contract would "support a recognized District function or purpose as well as provide good quality products and services at a reasonable cost[.]"

HORTON acknowledges that the District 65 Policy Manual also set forth the standards of conduct applicable to the District 65 superintendent and other district employees, including: (a) no District 65 employee was allowed to act as an "agent" of the district for "the purpose of acquiring profit or personal gain"; (b) no District 65 employee was allowed to solicit or accept "anything of monetary value from

contractors, potential contractors, or parties to agreements" with District 65; and (c) the superintendent of District 65 was required to annually file a Statement of Economic Interests form with the Cook County Clerk, which would disclose, among other things, certain income received during the preceding calendar year, as well as the nature and source of such income.

HORTON acknowledges that the District 65 Board was required to receive written notification in advance of board meetings of any contract between the district and a vendor-company that provided professional services to the district if the total value of the contract exceeded $25,000.

***The Scheme***

HORTON together with Antonio Ross, Samuel Ross, and Alfonzo Lewis (the "co-schemers") made materially false and fraudulent representations to make it falsely appear that HORTON had no personal or economic interest in certain of the contracts the Companies obtained with District 65. In truth, HORTON, in his capacity as District 65 superintendent, selected and caused to be selected the Companies associated with the co-schemers for the award of professional service contracts. HORTON also approved and caused the approval of invoices that Antonio Ross, Samuel Ross, and Alfonzo Lewis and their entities submitted to District 65. The false and fraudulent representations were made for the purpose of concealing that HORTON had a financial interest in the contracts and/or was receiving

kickbacks from the co-schemers from the payments District 65 made to the Companies.

HORTON, together with the co-schemers, caused the formation of the Companies to apply as vendor-companies for certain professional service contracts with District 65, and through the use of the Companies, concealed and disguised the fact that portions of payments that District 65 made to the Companies would be kicked back to HORTON.

HORTON, together with Antonio Ross, Samuel Ross, and Alfonzo Lewis, prepared and submitted and caused to be prepared and submitted to District 65 certain proposals, contracts, and invoices on behalf of the Companies in which they made false and fraudulent representations and material omissions to conceal the personal or economic interest of HORTON in the proceeds of certain of the Companies' contracts with District 65. The invoices purportedly sought payment from District 65 solely for the benefit of the Companies in exchange for work or services completed by the Companies when, as HORTON knew, a portion of the District 65 payments were intended for HORTON through kickbacks from the co-schemers.

HORTON concealed and caused to be concealed the fact that he had a personal or economic interest in certain of the contracts, including contracts valued at more than $25,000, that HORTON had awarded to the Companies and some of the proceeds of which contracts would be kicked back to HORTON.

HORTON approved and caused the approval of invoices submitted by the Companies to District 65 and thereby caused District 65 to issue checks and initiate electronic funds transfers to bank accounts associated with the co-schemers and the Companies. After Antonio Ross, Samuel Ross, Alfonzo Lewis and the Companies received payments from District 65 on the contracts for the Companies, Antonio Ross, Samuel Ross, Alfonzo Lewis caused to be paid to HORTON, or to a sibling of HORTON ("Individual A"), kickbacks of a portion of the payments made by District 65. In order to conceal the scheme, HORTON directed Antonio Ross and Alfonzo Lewis to transfer some of the kickback payments to a bank account associated with Individual A, and HORTON directed Individual A to transfer those funds to HORTON, which she did.

HORTON falsely omitted the income that he received from the co-schemers and the Companies on the Statement of Economic Interests form he filed for calendar year 2022 in order to conceal the kickback payments that he received from Antonio Ross, Samuel Ross, and Alfonzo Lewis.

***Connecting the Dots***

Between in or around October 2021, and in or around May 2023, HORTON selected and caused the selection of Connecting the Dots for the award of a professional service contract, contract amendment, and contract extension with District 65 in the total amount of approximately $139,500. HORTON and Antonio Ross prepared, submitted, and caused to be prepared and submitted false and

fraudulent documents to District 65 in the name of Connecting the Dots which concealed that HORTON would personally benefit from the Connecting the Dots' contract amendment, and/or contract extension with District 65 by receiving kickbacks from Antonio Ross from the proceeds of the contract amendment, and/or contract extension.

HORTON did not notify the District 65 Board about the professional service contract, contract amendment, and contract extension with Connecting the Dots, even though the total value of the contract, contract amendment, and contract extension between District 65 and Connecting the Dots exceeded $25,000.

HORTON approved and caused the approval of invoices that Antonio Ross and Connecting the Dots submitted to District 65 and District 65 paid those invoices. Antonio Ross kicked-backed approximately $41,900 to HORTON from the proceeds of the District 65 payments by paying HORTON directly or directing payments to HORTON through Individual A.

***<u>Asset Protection</u>***

Between in or around June 2022, and in or around June 2023, HORTON selected and caused the selection of Asset Protection for the award of two professional service contracts with District 65 in the total amount of approximately $119,500. HORTON and Samuel Ross prepared, submitted, and caused to be prepared and submitted, false and fraudulent documents to District 65 in the name of Asset Protection which concealed that HORTON would personally benefit from Asset

Protection's contracts with District 65 by receiving kickbacks from Samuel Ross from the proceeds of the contracts.

HORTON did not notify the District 65 Board about the professional service contracts with Asset Protection, even though the total value of the contracts between District 65 and Asset Protection exceeded $25,000.

HORTON approved and caused the approval of invoices that Samuel Ross and Asset Protection submitted to District 65 and District 65 paid those invoices. Samuel Ross kicked back approximately $30,800 to HORTON from the proceeds of the District 65 payments by paying HORTON directly.

***New Flight 35***

Between in or around November 2022, and in or around May 2023, HORTON selected and caused the selection of New Flight 35 for the award of a professional service contract with District 65 in the amount of approximately $24,500. HORTON and Alfonzo Lewis prepared, submitted, and caused to be prepared and submitted, false and fraudulent documents to District 65 in the name of New Flight 35, which concealed that HORTON would personally benefit from New Flight 35's contract with District 65 by receiving kickbacks from Alfonzo Lewis from the proceeds of the contract.

HORTON approved and caused the approval of invoices that Alfonzo Lewis and New Flight 35 submitted to District 65 and District 65 paid those invoices. Alfonzo Lewis kicked-backed approximately $9,000 to HORTON from the proceeds of

the District 65 payments by paying HORTON directly or directing payments to HORTON through Individual A.

For the purpose of executing the scheme described above, on or about April 19, 2022, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, HORTON knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email from Antonio Ross, with an attached contract amendment for the provision of professional services to District 65, that falsely represented that HORTON had no personal or economic interest in the business of Connecting the Dots, and which email was processed through servers outside of Illinois.

HORTON, Antonio Ross, Samuel Ross, and Alfonzo Lewis fraudulently obtained approximately $283,500 from District 65, and Antonio Ross, Samuel Ross, and Alfonzo Lewis and paid Horton at least $81,700 in kickbacks from the proceeds of District 65 contracts.

## ***Count 14***

Beginning on or about January 10, 2022, and continuing through on or about December 22, 2022, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, HORTON, being an agent of District 65, a unit of local government that received in excess of $10,000 in federal benefits during calendar years 2022 and 2023, knowingly embezzled, stole, and intentionally misapplied $5,000 or more owned by and under the care, custody, and control of District 65,

namely, the use of his District 65 P-Card for personal benefit, including the purchase of personal meals and gift cards and to pay for personal vehicle expenses, in violation of Title 18, United States Code, Section 666(a)(1)(A).

Within each twelve-month period during calendar years 2022 and 2023, District 65 was a unit of local government that received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, and other forms of federal assistance.

HORTON acknowledges that the District 65 Policy Manual authorized the superintendent to use a district procurement credit card ("P-Card") to simplify the acquisition, receipt, and payment of purchases and travel expenses incurred on the district's behalf. The District 65 Policy Manual required the superintendent's use of the P-Card to be limited to those expenses that were for the district's benefit and served a valid and proper public purpose. The District 65 Policy Manual prohibited the superintendent from using the P-Card for personal purchases.

Between on or about January 10, 2022, and continuing through on or about December 22, 2022, at Evanston, and elsewhere, HORTON, without the knowledge or consent of District 65, used his District 65 P-Card for personal benefit, including the purchase of personal meals and gift cards and to pay for personal vehicle expenses with an aggregate value of approximately $21,449.50.

In addition, between on or about January 1, 2023, and continuing through in or around June 2023, at Evanston and elsewhere, HORTON, without the

knowledge or consent of District 65, used his District 65 P-Card for personal benefit, including the purchase of personal meals and gift cards and to pay for personal vehicle expenses with an aggregate value of approximately $9,396.27.

***Count 16***

Between on or about January 1, 2022, and continuing through on or about May 27, 2023, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, HORTON did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar year 2022, in violation of Title 26, United States Code, Section 7201.

The Internal Revenue Service ("IRS") was part of the United States Department of Treasury and, among other things, was responsible for administering the tax laws of the United States and collecting taxes from individuals and entities. Individual taxpayers were required to file an annual United States Individual Tax Return, Form 1040, including schedules and attachments, with the IRS by a date certain, if the individual's gross income exceeded certain specified amounts. If a taxpayer failed to accurately report or pay his or her tax liability, the IRS could calculate, assess, and attempt to collect the correct tax liability.

Between on or about January 1, 2022, and continuing through on or about May 27, 2023, HORTON did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar year 2022, by committing the following affirmative acts, among others:

a. During calendar year 2022, HORTON deposited and caused to be deposited into his bank accounts at Bank of America and U.S. Bank thousands of dollars in kickback payments obtained from Antonio Ross and Samuel Ross, which funds originally derived from District 65;

b. During calendar year 2022, HORTON used his District 65 P-Card to purchase or pay for thousands of dollars of items for his own personal use or benefit;

c. HORTON provided his tax return preparer with records that underreported his income for calendar year 2022 and falsely represented to his tax return preparer his sources of income for calendar year 2022;

d. On or about March 21, 2023, HORTON filed a false Statement of Economic Interests form with the Cook County Clerk in order to conceal his sources of income for calendar year 2022; and

e. HORTON filed and caused to be filed a false 2022 Form 1040 on or about April 18, 2023, and filed and caused to be filed a false 2022 Amended Form 1040 on or about May 27, 2023;

In addition, between on or about January 1, 2023, and continuing through on or about August 29, 2024, HORTON did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar year 2023, by committing the following affirmative acts, among others:

a. During calendar year 2023, HORTON deposited and caused to be deposited into his bank accounts at Bank of America and U.S. Bank thousands of

dollars in kickback payments obtained from Antonio Ross, Samuel Ross, and Alfonzo Lewis, which funds originally derived from District 65;

b. During calendar year 2023, HORTON directed Antonio Ross and Alfonzo Lewis to transfer thousands of dollars in kickback payments derived from District 65 to Individual A;

c. During calendar year 2023, HORTON directed Individual A to transfer thousands of dollars of kickback payments received from Antonio Ross and Alfonzo Lewis to HORTON's bank account at Bank of America;

d. During calendar year 2023, HORTON used his District 65 P-Card to purchase or pay for thousands of dollars of items for his own personal use or benefit;

e. HORTON provided his tax return preparer with records that underreported his income for calendar year 2023 and falsely represented to his tax return preparer his sources of income for calendar year 2023; and

f. HORTON filed and caused to be filed a false 2023 Form 1040 on or about August 29, 2024.

HORTON's total income during calendar years 2022 and 2023 included over $10,000 in each year derived from criminal activity, namely, the receipt of kickbacks and the misuse of his District 65 P-Card for personal benefit. By the above-described means, HORTON caused the United States to realize a total tax loss of approximately $31,512.60.

## Maximum Statutory Penalties

7. Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a. Count 1 carries a maximum sentence of 20 years' imprisonment. Count One also carries a maximum fine of $250,000. Defendant further understands that with respect to Count 1 the judge also may impose a term of supervised release of not more than three years.

b. Count 14 carries a maximum sentence of 10 years' imprisonment. Count 14 also carries a maximum fine of $250,000. Defendant further understands that with respect to Count 14 the judge also may impose a term of supervised release of not more than three years.

c. Count 16 carries a maximum sentence of 5 years' imprisonment. Count 16 also carries a maximum fine of $250,000. Defendant further understands that the Court must order costs of prosecution, estimated not to exceed $500. Defendant further understands that with respect to Count 16 the judge also may impose a term of supervised release of not more than three years.

d. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

e. Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

f. Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 35 years' imprisonment. In addition, defendant is subject to a total maximum fine of $750,000, mandatory costs of prosecution, a period of supervised release, and special assessments totaling $300, in addition to any restitution ordered by the Court.

**Sentencing Guidelines Calculations**

8. Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the government's position as of the date of this Agreement is as follows[1]:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely, the November 2025 Guidelines Manual.

b. **Offense Level Calculations.**

**Count 1**

i. Pursuant to Guideline § 2C1.1(a)(1), the base offense level is 14 because defendant was a public official.

ii. Pursuant to Guideline § 2C1.1(b)(1), the offense level is increased by two levels because more than one kickback was involved.

iii. Pursuant to Guideline § 2C1.1(b)(2), the offense level is increased by 10 levels because the value of anything obtained by the defendant, a public official, or others acting with the public official was $283,500, which is more than $250,000 and less than $555,000.

---

[1] Defendant reserves the right to contest the government's Guideline calculations and applicability.

iv. Pursuant to Guideline § 2C1.1(b)(3), the offense level is increased by four levels because the offense involved a public official in a high-level decision-making or sensitive position.

v. Pursuant to Guideline § 3B1.1(c), the offense level is increased by two levels because the defendant was an organizer and leader of criminal activity involving fewer than five participants.

**Count 14 and Relevant Conduct**

i. Pursuant to Guideline § 2B1.1(a)(2), the base offense level is level 6.

ii. Pursuant to Guideline § 2B.1(b)(C), the offense level is increased by 4 levels under Guideline § 2B1.1(b)(1)(B) because the amount of the loss ($30,845) is more than $15,000 but less than $40,000.

iii. The offense level is increased by two levels because defendant abused a position of public trust in a manner that significantly facilitated the commission and concealment of the offense, pursuant to Guideline § 3B1.3.

**Count 16 and Relevant Conduct**

iv. Pursuant to Guideline §§ 2T1.1(a)(1) and 2T4.1(D), the base offense level is 12 because the tax loss was $31,512, which is more than $15,000 and less than $40,000.

v. Pursuant to Guideline § 2T1.1(b)(1), the offense level is increased by 2 levels because defendant failed to report income exceeding $10,000 in any year from criminal activity.

**<u>Grouping</u>**

vi. Pursuant to Guideline §§ 3D1.2(d) and 3D1.3(b), Counts One and Fourteen are grouped together ("Group One"), and the offense level applicable to the Group is the offense level for the most serious of the counts comprising the Group (i.e., the highest offense level of the counts in the Group), which is the offense level for Count One (32).

vii. Pursuant to Guideline § 3D1.2, Group One and Count 16 are not grouped and should be treated as separate groups. Pursuant to Guideline § 3D1.4(c), because Count Sixteen (offense level 14) is 9 or more levels less serious than Group One (offense level 32), there is no increase in the offense level.

viii. If by the time of sentencing the defendant has clearly demonstrated a recognition and affirmative acceptance of responsibility for his criminal conduct within the meaning of Guideline § 1B1.3, defendant should receive a two-level reduction in the offense level. At the present time, given that the defendant may contest the application of certain guidelines, the government reserves its position on this adjustment until the time of sentencing. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and

permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

ix. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

c. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, if the Court determines that defendant has clearly demonstrated a recognition and affirmative acceptance of responsibility for his criminal conduct within the meaning of Guideline § 1B1.3, based on the facts now known to the government, the government anticipates the offense level to be 29, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 87 to 108 in addition to any supervised release and fine the Court may impose. If the Court determines that defendant has not clearly demonstrated a recognition and affirmative acceptance of responsibility for his criminal conduct within the meaning of Guideline § 1B1.3,based on the facts now known to the government, the government anticipates the offense level to be 32, which, when combined with the anticipated criminal history category of I, results in

an anticipated advisory sentencing guidelines range of 121 to 151 months' imprisonment.

d. Defendant and his attorney and the government acknowledge that the guidelines calculations set forth in this Agreement are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands the above government calculations are based on information now known to the government and that further review of the facts or applicable legal principles may lead the government to change its position on the guidelines calculations. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the defendant's, the probation officer's, or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of a change in the government's position on the guideline calculations or the Court's rejection of these calculations.

i. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by the government prior to sentencing. The government may correct these errors by a statement to the Probation Office or the Court, setting forth any changes in the government's position

regarding the guidelines calculations. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea on the basis of such corrections.

**Agreements Relating to Sentencing**

10. Each party is free to recommend whatever sentence it deems appropriate.

11. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

12. Defendant agrees to pay restitution to any victims in an amount to be determined by the court, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing.

13. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

14. Regarding restitution, defendant agrees to pay restitution to the United States Treasury arising from the offense conduct and relevant conduct set forth above, totaling $31,512, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664. Defendant further understands that the Internal Revenue Service will use the amount of restitution ordered as a basis of a civil assessment under Title 26, United States Code, Section 6201(a)(4). Defendant understands that the amount of tax loss as calculated by the Internal Revenue Service may exceed the amount of tax due as calculated for restitution in this criminal case.

15. Defendant further agrees to pay restitution to the Illinois Department of Revenue arising from the offense conduct and relevant conduct set forth above, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664. Defendant understands that the amount of tax loss as calculated by the Illinois Department of Revenue may exceed the amount of tax due as calculated for restitution in this criminal case.

16. Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17. Defendant agrees to pay the special assessment of $300 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the amended indictment as to defendant.

**Forfeiture**

19. Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

20. In addition, defendant agrees to the entry of a forfeiture money judgment in the amount to be determined by the court to include the value of any kickbacks received by the defendant. The defendant agrees that the amount of the forfeiture money judgment represents property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of defendant's violations of Title 18, United States Code, Sections 666(a)(1)(A) and 1343. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the forfeiture money judgment he will be ordered to pay.

21. Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the forfeiture money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

22. Defendant understands that forfeiture shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Department of Justice will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

23. Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

24. This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 25 CR 654.

25. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial

civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

26. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be

drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii. With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b. **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

27. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

**Presentence Investigation Report/Post-Sentence Supervision**

28. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him,

and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

29. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

30. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient

evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

31. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

32. Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

33. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

34. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court

permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

35. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

36. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

37. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: October 5, 2016

Andrew S. Boutros / RMR
ANDREW S. BOUTROS
United States Attorney

Emily C.R. Vermylen
EMILY C.R. VERMYLEN
ELIE ZENNER
MORRIS PASQUAL
Assistant United States Attorneys

DEVON HORTON
Defendant

TERENCE CAMPBELL
Attorney for Defendant